# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Charleston County Assessor, Petitioner-Respondent,

v.

University Ventures, LLC, Respondent-Petitioner.

Appellate Case No. 2017-002369

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From The Administrative Law Court
Shirley C. Robinson, Administrative Law Judge

---

Opinion No. 27907
Heard February 21, 2019 – Filed July 24, 2019

---

## AFFIRMED AS MODIFIED

---

Joseph Dawson III, Bernard E. Ferrara Jr., Austin Adams
Bruner and Johanna S. Gardner, all of North Charleston,
for Petitioner-Respondent.

Morris A. Ellison and William T. Dawson III, both of
Womble Bond Dickinson (US), LLP, of Charleston, for
Respondent-Petitioner.

---

**JUSTICE KITTREDGE:**      In 2006, University Ventures, LLC (the Taxpayer) purchased a vacant lot in Charleston County (the Property).  In 2008, the Taxpayer received building permits to construct a hotel and pool on the Property.

Construction began, and the hotel and pool were completed in April 2009, at which time a certificate of occupancy was issued. As a result of the completed improvements and pursuant to law, the Charleston County Assessor (the Assessor) reappraised the Property. The new appraisal resulted in an increase in the value of the Property, which in turn increased the Taxpayer's 2010 property tax bill. The Taxpayer paid the increased 2010 tax bill without objection.

This case concerns the Taxpayer's challenge to the 2011 tax bill. In 2011, the Assessor continued to value the Property as an improved lot, which it in fact was. The Taxpayer protested and claimed its 2011 tax bill should have been based on the Property's value as a vacant lot as of December 31, 2008. The court of appeals rejected the Taxpayer's argument, finding it would be absurd to value the Property as a vacant lot after improvements were completed.

This appeal requires us to construe statutes addressing the process for reassessing real property and reconcile those with statutes that address the value of improvements to real property. For reasons we explain below and consistent with South Carolina's statutory scheme, we find that when the value set by a reassessment program's uniform date of value conflicts with the value set by the completion of improvements to property, the improvement value controls. We therefore affirm the court of appeals' decision as modified.

## I.

It appears the parties' dispute is the result of their different interpretations and usages of the term "reassessment." As a result, we use terminology in this opinion that the parties and courts have not previously used in an effort to make clear which portions of the reassessment cycle we are discussing at any given time.

The South Carolina Department of Revenue (DOR) must periodically order the reassessment of real property to ensure it is "assessed uniformly and equitably throughout the State." S.C. Code Ann. § 12-43-210(A) (2014); *id.* § 12-4-510(3) (2014). In 1995, the General Assembly enacted section 12-43-217, initially requiring "each county or the State [to] appraise and equalize those properties under its jurisdiction" by conducting a reassessment program once every four years. Act No. 145, 1995 S.C. Acts 900, 1483–84. However, the next year, the General Assembly amended the statute to provide:

> Notwithstanding any other provision of law, once every *fifth* year each county or the State shall appraise and equalize those properties under its jurisdiction. Property valuation must be complete at the end of

December of the fourth year [hereinafter, an Appraisal Year] . . . . In the fifth year, the county or State shall implement the program and assess all property on the newly appraised values [hereinafter, an Implementation Year].

Act No. 431, 1996 S.C. Acts 2605, 2616–17 (emphasis added); S.C. Code Ann. § 12-43-217(A) (2014).[1] Counties applied section 12-43-217 retroactively, meaning they began implementing the reassessment program outlined in the statute five years after each county's respective most-recent Implementation Year. *See Old Citadel Assocs., L.L.C. v. Charleston Cty. Assessor*, No. 03-ALJ-17-0149-CC, 2004 WL 3154634, at *12 (S.C. Admin. Ct. Mar. 29, 2004) (explaining a prospective application in which every county implemented the new program in 1997 "would have created a nightmare for the [DOR] since it is charged by statute to oversee each of the 46 counties as they prepare for and conduct their reassessments").

In February 1997, the Director of the DOR ordered Charleston County to complete its next "reassessment" (i.e., countywide appraisal) by December 31, 1999, and implement the revised values in the tax year 2000 (the 2000 reassessment).[2] *Id.* at *13. However, in 1999, in the middle of Charleston County's reappraisal process, the General Assembly amended section 12-43-217 to add subsection (B), which provides:

A county by ordinance may postpone for not more than one property tax year the implementation of revised values resulting from the equalization program provided pursuant to subsection (A). . . . The

---

[1] Section 12-43-217 and the parties all refer to a "quadrennial" reassessment despite the fact that the statute requires reassessment to occur every five years. Presumably, this error harkens back to the original version of the statute requiring a reassessment to occur every four years, and, when the statute was amended to require reassessment every five years, the reference to "quadrennial" reassessment was overlooked.

[2] As we explain later, the parties and courts have used the term "reassessment" imprecisely to mean, depending on the context in which it is used, either the countywide appraisal *or* the implementation of the revised values from the appraisal.

postponement allowed pursuant to this subsection does not affect the schedule of the appraisal and equalization program required pursuant to subsection (A) of this section.

Act No. 93, 1999 S.C. Acts 295, 316. The amendment took effect on July 1, 1999. Subsequently, Charleston County adopted Ordinance No. 1125, postponing the implementation of the revised values resulting from the 1999 countywide appraisal from tax year 2000 (as ordered by the DOR) to tax year 2001. *See Old Citadel*, 2004 WL 3154634, at *13.

From the first time the Assessor began following section 12-43-217's five-year reassessment cycle (during the 1999 countywide appraisal), he differentiated between Year 4 of the cycle (an Appraisal Year[3]) and Year 3 of the cycle (hereinafter, a Value Year). By this, we mean that although the Assessor conducted the appraisals in Year 4 of a given reassessment cycle, he determined the value of each property in the county based on the property's worth as of December 31 of Year 3. *See* S.C. Code Ann. § 12-37-900 (Supp. 2018) (stating that for tax purposes, the value of a piece of property is determined by its value on December 31 of the preceding year); *Lindsey v. S.C. Tax Comm'n*, 302 S.C. 274, 275 n.1, 395 S.E.2d 184, 185 n.1 (1990) ("The pertinent date to determine the value of property for a given tax year is December 31st of the preceding year."). For example, in the first reassessment program conducted in Charleston County after the enactment of section 12-43-217, the Assessor reappraised properties in 1999 (an Appraisal Year) at the DOR's order, but "valued" the properties (i.e., determined the value of each property being appraised) as of December 31, 1998.[4] *See Old Citadel*, 2004 WL 3154634, at *2.[5]

---

[3] *See* S.C. Code Ann. § 12-43-217(A) ("Property valuation must be complete at the end of December of the fourth year . . . .").

[4] The gravamen of the Taxpayer's argument is that, in the Taxpayer's opinion, there is no legal distinction between Year 3 and Year 4 of a cycle, nor should there be.

[5] Specifically, *Old Citadel* states "Charleston County undertook a countywide reassessment of all real property within the county for the tax year 2000," but delayed the implementation of the reassessment to 2001. The order goes on to explain that, "[a]s a result of the reassessment, [the taxpayers'] properties were revalued as of December 30 [sic], 1998." We provide this information to demonstrate the imprecise language used by prior courts which have addressed the reassessment cycles created in section 12-43-217. Specifically, we believe it is an

The Assessor thereafter kept to the five-year reassessment cycle set forth in section 12-43-217:

- Conducting a countywide appraisal every five years (i.e., all calendar years ending in the numbers 4 or 9 were/are Appraisal Years: 1999, 2004, 2009, 2014, 2019, etc.);

- Basing the value of each property on the property's worth as of December 31 of the year preceding the Appraisal Year (i.e., all calendar years ending in the numbers 3 or 8 were/are Value Years: 1998, 2003, 2008, 2013, 2018, etc.); and

- Implementing the revised values the year following the Appraisal Year (i.e., all calendar years ending in the numbers 0 or 5 were/are Implementation Years: 2000, 2005, 2010, 2015, 2020, etc.). Aside from the initial implementation of the 2000 reassessment that was delayed to 2001 by Ordinance No. 1125, Charleston County has delayed the Implementation Year only once, from tax year 2010 (i.e., the 2010 reassessment, which is the subject of this appeal) to 2011.

## II.

As mentioned at the outset, in December 2006, the Taxpayer bought the Property, which, at that point, was a vacant lot. In 2008, the Taxpayer received two building permits from the City of North Charleston to begin construction of a hotel and pool. In April 2009, the improvements were completed, and the City of North Charleston issued a certificate of occupancy. As a result of the completed improvements in 2009 and the associated increase in property value, the Assessor reappraised the Property and issued a 2010 tax bill valuing the Property (with the fully-constructed hotel and pool) at $8,180,000 and billing the Taxpayer for $122,356.44. *See* S.C. Code Ann. §§ 12-37-670(A)–(B)(1), -3140(E) (2014). The Taxpayer paid this bill. At no time did the Taxpayer in any manner challenge the

---

oversimplification to state Charleston County undertook a countywide *reassessment* for the tax year 2000. Rather, to be more precise, the Assessor *reappraised* all property in the county in 1999 (an Appraisal Year)—backdating the values to 1998 (a Value Year) in accordance with section 12-37-900 and *Lindsey*—and, on the DOR's orders, was scheduled to *implement* the revised values in 2000 (an Implementation Year), which was delayed to 2001 by county ordinance in accordance with section 12-43-217(B).

2010 tax bill based on the 2009 improvements and increased property value. In fact, the Taxpayer concedes the increased property value in 2009 based on the completed hotel and pool, and the resulting 2010 tax bill, were proper. Yet the Taxpayer, relying on the reassessment statutes, argues the 2011 tax bill must be based on the value of the Property as of December 31, 2008, as a vacant lot. We disagree.

Irrespective of the improvements to the Property, throughout 2009, the Assessor conducted a countywide appraisal of all properties, setting the uniform value date for the appraisal as December 31, 2008 (2008 being a Value Year). Likewise, while 2010 was initially scheduled to be an Implementation Year, the Charleston County Council adopted Ordinance No. 1586, delaying the implementation of the 2010 reassessment (i.e., the implementation of the revised values from the 2009 appraisal) from 2010 to 2011. Aside from delaying the implementation, Ordinance No. 1586 did "not affect the schedule of the appraisal and equalization program required pursuant to S.C. Code Ann. Section 12-43-217."

As a result, in June 2011, the Assessor sent out notifications to those taxpayers in Charleston County whose property values would be subject to an increase pursuant to the 2010 reassessment, including the Taxpayer.[6] In the notice, the Assessor explained Charleston County was "required by state law to implement a reassessment in 2011," and "by law, properties must be valued as of 12/31/2008"— a date on which the improvements to the Property were not yet completed. (Emphasis omitted.) The Assessor nonetheless stated the Property's "current market value" had been recalculated for the reassessment as $9,630,000 based on the 2009 completed hotel and pool, but the Property's increase in value between 2010 and 2011 was statutorily capped at $9,407,000.[7] In September 2011, the Taxpayer filed a written objection to the Assessor's recalculated valuation of the Property. As noted, the Taxpayer's position was that the County was stuck with the December 31, 2008 value based on the Property's status as a then-vacant lot. The Assessor refused to make any adjustments.

---

[6] *See* S.C. Code Ann. § 12-43-217(A) ("[T]he county or State shall notify every taxpayer of any change in value or classification if the change is one thousand dollars or more.").

[7] *See* S.C. Code Ann. § 12-37-3140(B) (limiting any increase in fair market value of real property that is attributable to a reassessment program to fifteen percent within a five-year period).

The Taxpayer then appealed to the Charleston County Board of Assessment Appeals (the Board), asserting the Property's improvements were incomplete on the uniform date of value (December 31, 2008). According to the Taxpayer, the Assessor was therefore required to value the Property as a vacant lot for the 2010 reassessment implemented in 2011. The Taxpayer asked the Board to set a land-only value for the Property of $628,439. Ultimately, the Board agreed with the Taxpayer, valuing the Property at $628,439 "based on the land value of the parcel and the building being incomplete at the end of 2008."

The Assessor filed a request for a contested case hearing with the Administrative Law Court (ALC). During the opening statements at the hearing, the Assessor stated the "real question" was whether improvements completed during an Appraisal Year (i.e., improvements that were incomplete during a Value Year) should count toward the revised property values implemented during a reassessment program. The Assessor argued that a decision upholding the Board's order would force the Assessor to value parcels whose improvements were completed before the end of an Appraisal Year as undeveloped lots. According to the Assessor, such a decision "leads almost to an absurd result . . . because then people would just wait to [request] a certificate of occupancy until after [a Value Year] so their property could escape reassessment" for the next five years.

In response, the Taxpayer argued the Assessor was misrepresenting which calendar year equated to the Appraisal Year (i.e., Year 4 in the cycle). While the Assessor contended 2009 (the year the improvements to the Property were completed) was an Appraisal Year, the Taxpayer asserted 2008 was the Appraisal Year based on the parties' stipulation that December 31, 2008, was the uniform date of value.[8]

---

[8] According to the Taxpayer, the preceding reassessment cycle was implemented in 2005 (the 2005 reassessment) after implementation was delayed for one year from 2004, and had a uniform date of value of December 31, 2003. As a result, the Taxpayer contends the five-year cycle set forth in section 12-43-217 requires the next appraisal to have occurred in 2008, and the next implementation to have occurred in 2009. However, there is no evidence the 2005 reassessment was delayed one year, as the Taxpayer contends. *See, e.g., Charleston County Ordinances*, Charleston Cty., https://www.charlestoncounty.org/ordinances.php (last visited May 17, 2019) (including a copy of Ordinance No. 1586, delaying the implementation of the 2010 reassessment, but containing no ordinance purporting to similarly delay the 2005 reassessment).

The Taxpayer also claimed the purpose of a reassessment was to equalize, relative to one another, values for properties which may have been appraised at different points in a county's past. As a result, the Taxpayer contended it was fundamentally unfair that all properties in Charleston County would be valued on the same day except for the Property and other parcels whose improvements were incomplete on the uniform date of value but were completed during the following calendar year (i.e., during an Appraisal Year).

Finally, the Taxpayer noted it was

> important to emphasize [its argument the Property should be taxed as a vacant lot was only applicable] for tax year 2011. For tax year 2012 and forward, you value the [P]roperty based on the fact that the certificate of occupancy has been issued. So we're talking about one tax year [that the Taxpayer should be entitled to pay lower taxes as if the Property were a vacant lot]; we're not talking about multiple tax years here because the statutes allow the Assessor to come back in 2012 and reassess because that limiting factor [having to conform to the reassessment cycle's uniform date of value] isn't present anymore.

The Taxpayer did not specify which statutes would allow the Assessor to "come back in 2012 and reassess" in the middle of a reassessment cycle; nor did it cite any other authority for its contention that the Property should be taxed at its full value in 2010, taxed as a vacant lot in 2011, and taxed again as a completed property in 2012.

Walter Ziegler, a long-term employee in the Assessor's Office, testified on behalf of the Assessor. During direct examination, he testified about the pertinent dates and values related to the Property, including the date the certificate of occupancy was issued and the dates and amounts associated with various tax bills. Ziegler also explained the Assessor's treatment of the Property during the 2010 reassessment was not unique because the Assessor included the value of completed improvements for any property in Charleston County that received a certificate of occupancy in 2009.

During cross-examination, Ziegler confirmed that the first time the Assessor reassessed the Property with its improvements was in the 2010 tax year. Ziegler also stated the last reassessment (i.e., the 2005 reassessment) had a uniform value date of December 31, 2003.

Following the hearing, the ALC determined the Assessor had misconstrued section 12-43-217, holding the reassessment cycle was comprised of the calendar years 2005 through 2009, rather than 2006 through 2010 as the Assessor contended. Likewise, the ALC found that because the improvements to the Property were not complete as of the uniform date of value (December 31, 2008), the Property should have been valued as vacant land for purposes of the 2010 reassessment, setting the value of the "vacant lot" at $860,537 after averaging valuations provided by the Taxpayer's and Assessor's expert witnesses.

The Assessor appealed, and the court of appeals affirmed the ALC's findings of which calendar years fell within the reassessment cycle, but reversed the ALC's valuation of the Property. *Charleston Cty. Assessor v. Univ. Ventures, L.L.C.*, 421 S.C. 194, 209–10, 805 S.E.2d 216, 225 (Ct. App. 2017). In particular, the court of appeals found support in the case law for the Taxpayer's contention that 2009 was the end of the five-year reassessment cycle surrounding the 2010 reassessment. *See Charleston Cty. Assessor v. LMP Props., Inc.*, 403 S.C. 194, 197, 743 S.E.2d 88, 89 (Ct. App. 2013) ("[T]he parties[, including the Assessor,] agreed that the date for valuing properties was December 31, 2003, because 2004 [(i.e., five years before 2009)] was the year of the countywide reassessment.").[9] The court of appeals also determined the confusion in this case stemmed from the Assessor's delay of the "1999 reassessment to 2001, instead of 2000" because the two-year "delay" caused the Assessor to mistake the permissible one-year delay in implementation with an impermissible one-year delay in valuation and appraisal. Thus, the court of appeals concluded the Assessor had created a six-year reassessment cycle through a "repeated pattern of delaying the implementation year."

Nonetheless, the court of appeals reversed the ALC's valuation of the Property, ultimately rejecting both parties' arguments as to the proper method of valuation. In disagreeing with the Taxpayer's argument that the Property should be valued as a vacant lot, the court of appeals concluded the Assessor's valuation of the Property in 2010 was the most recent and accurate reflection of the Property's worth, and it would be wholly inappropriate to value a parcel with a completed hotel as if it were a vacant lot. Likewise, in dismissing the Assessor's argument that the Property should be reassessed for the 2011 tax year higher than the 2010 tax year,

---

[9] The court of appeals additionally cited several ALC cases allegedly standing for the proposition that 1999 was also, in its words, "a reassessment year," thus providing further support for its conclusion that the reassessment cycles ended in 2004 and 2009, as the Taxpayer argued.

the court of appeals found that had the 2010 reassessment not been delayed one year, the Assessor would not have been able to reassess the Property for the 2011 tax year, and the delay alone did not authorize a belated re-appraisal date. The court of appeals therefore set the value of the Property for the 2010 reassessment at its value during the 2010 tax year.

Both parties appealed. The Assessor did not appeal the court of appeals' valuation determination, challenging instead the court's characterization of the years in the reassessment cycle(s). The Taxpayer contested the valuation determination, arguing the Property should be valued as a vacant lot for the 2011 tax year. We granted the parties' cross-petitions for writs of certiorari seeking review of the court of appeals' decision.

## III.

The Assessor argues the lower courts erred in finding the Assessor's actions have created a six-year reassessment cycle. Specifically, the Assessor avers he has consistently followed section 12-43-217's five-year reassessment cycle since the statute's enactment, and any confusion and/or evidence to the contrary is the result of the inconsistent usage by the parties and courts of the terms "reassessment" and "reassessment year" to mean both an Appraisal Year and an Implementation Year. The Assessor also contends there is, and must be, a legal distinction between a Value Year and an Appraisal Year. Finally, the Assessor asserts his application of section 12-43-217's reassessment cycle has been consistent since the statute's enactment more than twenty years ago. We agree with the Assessor.

## A.

Section 12-43-217(A) provides in part, "Property valuation [for a given five-year reassessment cycle] must be complete at the end of December of the fourth year . . . ." "The pertinent date to determine the value of property for a given tax year is December 31st of the preceding year." *Lindsey*, 302 S.C. at 275 n.1, 395 S.E.2d at 185 n.1.

The Assessor contends, and we agree, that section 12-37-900 and *Lindsey* both require the Assessor to value properties appraised during an Appraisal Year at their worth on December 31 of the preceding year, or in other words, December 31 of the Value Year. As a result, if—as the parties stipulated—the uniform date of value for the 2010 reassessment is December 31, 2008, that necessarily means: (1) 2008 is a Value Year; (2) the Assessor conducted the countywide appraisal in 2009; and (3) 2009 is therefore an Appraisal Year.

The court of appeals found section 12-43-217(A) creates an exception to section 12-37-900 and *Lindsey*. See *Univ. Ventures*, 421 S.C. at 205 n.7, 805 S.E.2d at 222 n.7. Specifically, the court of appeals found significant section 12-43-217(A)'s mandate to complete "property valuation" in Year 4 of a given reassessment cycle. *See* S.C. Code Ann. § 12-43-217(A) ("*Property valuation* must be complete at the end of December of the fourth year . . . ." (emphasis added)). According to the court of appeals, a plain reading of the phrase "property valuation" requires the valuation and appraisal to occur in the same year (Year 4), unlike what section 12-37-900 and *Lindsey* would otherwise require.

This interpretation of sections 12-43-217(A) and 12-37-900 reads a conflict into the statutes where none exists. *Cf. Hodges v. Rainey*, 341 S.C. 79, 88, 533 S.E.2d 578, 583 (2000) ("Statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative."); *id.* at 91, 533 S.E.2d at 584 ("The goal of statutory construction is to harmonize conflicting statutes whenever possible and to prevent an interpretation that would lead to a result that is plainly absurd."). Reading the statutes in harmony with one another, section 12-43-217(A) requires a county assessor to conduct a countywide appraisal in Year 4 of the cycle (the Appraisal Year); and section 12-37-900 fills in the details about how, precisely, to value the properties in that appraisal, namely by calculating their worth as of December 31 of the preceding year (the Value Year). *Cf. LMP Props.*, 403 S.C. at 200, 743 S.E.2d at 91 ("Section 12-43-215 states merely that any adjustments to a property's value must be 'based on the market values of real property as they existed in the year that the equalization and reassessment program was conducted.' *The statute is silent on the date to be used for determining the highest and best use of the property. Accordingly, **it cannot be read to mandate a diversion from the general rule that the use of the property is to be determined as of December 31st of the preceding year**. Such a finding would result in potentially unreasonable and illogical valuations* in instances when the use of a property changes, potentially dramatically, from the time of the last countywide reassessment." (internal alteration marks omitted) (emphasis added)).

The court of appeals' interpretation of section 12-43-217(A) as requiring the valuation and appraisal to occur in the same year defeats the legislative intent underlying the reassessment cycles. *See Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342–43, 713 S.E.2d 278, 283 (2011) ("Courts will reject a statutory interpretation that . . . would defeat the plain legislative intention."). In particular, the General Assembly charged the government with assessing all property "uniformly *and equitably* throughout the State." S.C. Code Ann. § 12-43-210(A)

(emphasis added).  However, failing to distinguish between a Value Year and an Appraisal Year leads to inequitable consequences to taxpayers.

For example, requiring the Assessor to set a uniform date of value of December 31 of the same calendar year he conducts the appraisals would essentially require the Assessor—who may appraise properties at any time during the year—to guess what the future values of the properties would be at the end of that year and assume market conditions will stay the same between the time of the appraisal and the end of the year.  Clearly, guessing the future values of properties is a wholly inequitable method of conducting a reassessment, particularly because the values of properties appraised later in the year will tend to be more accurate as market trends become more apparent closer to the uniform date of value.  Because properties appraised in the earlier part of the year would not enjoy the same benefit—namely, a greater degree of accuracy in determining their values—we find valuing and appraising properties in the same year is inequitable and not what the legislature intended.

Likewise, even if the Assessor did not guess at the future value and merely set the value of each individual property the day of its respective appraisal, properties evaluated at the end of the year could be at a disadvantage due to having an extra year's worth of appreciation added to their value compared to properties evaluated at the beginning of the year.[10]  Moreover, while a year's worth of appreciation may not, in most instances, represent a large change in value for a given property, if the market took a drastic downturn or upturn compared to the beginning of the year, properties valued/appraised before and after the change would have grossly disparate tax burdens.  This, too, would be inequitable, and is easily avoidable by distinguishing between a Value Year and an Appraisal Year.

---

[10] For instance, all aspects of the properties being relatively equal, if a county assessor appraised *and* valued Property X on January 2 of an Appraisal Year, and appraised *and* valued Property Y on December 31 of the same year, Property Y would have approximately an entire year's worth of extra appreciation in value over Property X, and as a result would have a higher tax burden than Property X. In contrast, if the county assessor looked at the values of both Property X and Property Y as of December 31 of the year preceding the appraisals, presumably the properties would have approximately the same amount of appreciation in value from the last appraisal.

As a result, we believe the Assessor is correct in stating there is a legal distinction between a Value Year and an Appraisal Year, and policy considerations dictate such a distinction is the most equitable way to conduct countywide appraisals.

**B.**

During oral arguments, the Taxpayer contended five other counties in our state do not follow the same approach—Value Year (Year 3)/Appraisal Year (Year 4)/Implementation Year (Year 5)—as the Assessor.[11] While this may be correct, those counties nonetheless distinguish between a Value Year and an Appraisal Year, instead combining the Appraisal and Implementation Years. For example, in a post dated January 23, 2019, the Horry County Assessor's website stated, "The Horry County Assessor's Office is in the process [in January 2019] of appraising all property values at fair market value as of December 31, 2018. This new value will be used for calculating property tax bills issued by Horry County during October 2019."[12] Thus, in Horry County, it appears 2019 is an Appraisal *and* Implementation Year, where the Horry County Assessor's Office conducts its appraisals in the first half of 2019 and sends out the revised tax bills during the second half of 2019. However, Horry County's Value Year (2018) is still different than its Appraisal Year (2019).

Assuming the DOR has approved the reassessment timelines in these other counties, this may be a reasonable approach to interpreting the ambiguous phrase "property valuation" in section 12-43-217(A). We limit our finding only to hold that the Value Year and Appraisal Year may not be the same, but do not decide whether the Appraisal Year and Implementation Year may—or must—occur simultaneously.

Nonetheless, we note the DOR's Property Tax Manual states, "A countywide *reappraisal* takes place every five years. Usually, a countywide reassessment program is *implemented the next year*."[13] In interpreting section 12-43-217(A)

---

[11] The Taxpayer specifically cited Beaufort, Berkeley, Greenville, Horry, and Spartanburg counties.

[12] *News and Announcements: Countywide Reassessment of Real Properties Underway for 2019 Tax Year*, Horry Cty. Gov't (Jan. 23. 2019), https://www.horrycounty.org/News/PostId/1219/countywide-reassessment-of-real-properties-underway-for-2019-tax-year.

[13] S.C. Dep't of Revenue, *South Carolina Property Tax* 11 (2015),

differently from Horry County and others, the Assessor seemingly follows this approach set forth by the DOR.[14]

Additionally, the Assessor has been conducting its reassessments in this manner since the enactment of section 12-43-217 in 1996.  In particular, in February 1997, the DOR ordered the Assessor to "complete a reassessment program for the 1999 tax year with implementation of the reassessment program in tax year 2000."  The Assessor interpreted the DOR's order to "complete a reassessment program" and implement it the following year as meaning he was required to take *some* action— i.e., conduct a countywide appraisal—in 1999 and then implement the revised values the following year.  The Assessor has distinguished an Appraisal Year from an Implementation Year ever since.

We have previously "held in many cases that where the construction of the statute has been uniform for many years in administrative practice, and has been acquiesced in by the General Assembly for a long period of time, such construction is entitled to weight, and should not be overruled without cogent reasons."  *Etiwan Fertilizer Co. v. S.C. Tax Comm'n*, 217 S.C. 354, 359, 60 S.E.2d 682, 684 (1950); *see also Purdy v. Moise*, 223 S.C. 298, 305, 75 S.E.2d 605, 608 (1953) (finding a municipality's "construction of its own ordinance, the enforcement of which it is charged with, should be given some consideration and not overruled without cogent reason therefor").  Here, the DOR's and the Assessor's interpretation of section 12-43-217 has been consistent since the statute's enactment, and has been successfully defended in multiple cases before the ALC and court of appeals.  As a result, the Assessor's interpretation of section 12-43-217 is entitled to some deference.

---

https://dor.sc.gov/resources-site/publications/Publications/Property_Tax_Guide.pdf (emphasis added).

[14] The Taxpayer argues this portion of the DOR's Property Tax Manual says nothing about differentiating between a Value Year and an Appraisal Year. However, the DOR has no authority to ignore state statute or this Court's precedent—i.e., section 12-37-900 or *Lindsey*—nor do we read the Property Tax Manual in derogation of those principles.  Rather, the Assessor's recognition of a Value Year, an Appraisal Year, and an Implementation Year harmonizes the Property Tax Manual, the DOR's orders, and section 12-37-900 and *Lindsey*.

Accordingly, we find that, as with Horry County's approach, the Assessor's approach is a reasonable interpretation of section 12-43-217(A) that results in few—if any—inequitable consequences to taxpayers.

## C.

In sum, there is a legally required distinction between a Value Year and an Appraisal Year. Because the parties stipulated December 31, 2008, was the uniform date of value, necessarily, 2008 must have been a Value Year in Charleston County. Consequently, section 12-37-900 and *Lindsey* required 2009 to be an Appraisal Year. Likewise, the DOR's Property Tax Manual and section 12-43-217(A) required 2010 to be an Implementation Year, and section 12-43-217(B) allowed the Charleston County Council to delay implementation by one year to 2011. This timing aligns without a single gap or inconsistency with the historic dates related to the enactment of section 12-43-217 and Charleston County's previous reassessment cycles, in that each relevant date for the reassessments falls five years after the corresponding date in the last reassessment (aside from the two permissible one-year, *implementation-only* delays in 2000 and 2010).

Accordingly, we find the court of appeals erred in finding the 2010 reassessment consisted of the calendar years 2005, 2006, 2007, 2008 (the Value *and* Appraisal Year), and 2009 (the Implementation Year, allegedly impermissibly delayed two years to 2011 in violation of section 12-43-217(B)). Instead, we hold the 2010 reassessment consisted of the calendar years 2006, 2007, 2008 (the Value Year), 2009 (the Appraisal Year), and 2010 (the Implementation Year, before it was delayed by Ordinance No. 1586 to 2011).

## IV.

As to the proper value of the Property for the 2010 reassessment, the Taxpayer argues the court of appeals erred in reversing the ALC's decision to value the Property as a vacant lot. We disagree.

As an initial matter, the Assessor did not appeal the court of appeals' valuation determination. As a result, the Assessor has abandoned his argument below that the Property should be reappraised and reassessed in 2011 at a higher tax burden than that of the 2010 tax year—a tax burden which the Taxpayer paid without protest. *See Video Gaming Consultants, Inc. v. S.C. Dep't of Revenue*, 342 S.C. 34, 42 n.7, 535 S.E.2d 642, 646 n.7 (2000) (stating an issue is deemed abandoned if a party fails to make an argument as to the merits of the issue). Therefore, the only

argument before us is the Taxpayer's argument that the Property should be taxed at its full value in 2010, taxed as a vacant lot in 2011, and taxed again as a developed property in 2012.

The General Assembly has clearly evidenced its intent for the value of improvements to control over the values set by a reassessment program. *See* S.C. Code Ann. § 12-37-3120 (2014) ("If the provisions of this article are inconsistent with other provisions of law, the provisions of this article apply."); *id.* § 12-37-3140 (containing, in the same article, the statute related to determining fair market value based on improvements to real property). Presumably, this is because the value set when the improvements are completed is the most current and accurate estimate of a property's worth and, therefore, the valuation would not need to be updated via a reassessment program. *Cf. id.* § 12-37-3140(A)(1) (stating a property's fair market value is the value applicable at the later of specified dates); *id.* § 12-37-3140(B) (stating an increase in value attributable to improvements overrides the fifteen percent cap in increased value otherwise applicable to reassessment programs). As the court of appeals explained, it would be both absurd and contrary to statute to set the value of the Property for the 2010 reassessment as if it was still a vacant lot, notwithstanding the uniform date of value for the reassessment. *See id.* §§ 12-37-670(A), -3140(E).

We therefore find the court of appeals did not err in setting the value of the Property at $8,180,000 for purposes of the 2010 reassessment.

## V.

In conclusion, we hold the value of property must be determined as of its worth on December 31 of the year preceding that of the appraisal. We also hold, in accordance with section 12-37-3120, that when a property is valued differently using a reassessment program's uniform date of value and the date of completion of improvements to the property, the improvement value necessarily is controlling. Accordingly, while we find the court of appeals erred in analyzing which years properly fell within Charleston County's 2010 reassessment, it reached the correct result in valuing the Property. We therefore affirm the court of appeals' decision as modified.

**AFFIRMED AS MODIFIED.**

**BEATTY, C.J., HEARN, FEW and JAMES, JJ., concur.**